

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

August 27, 2019

<u>By ECF</u>

The Honorable Lewis A. Kaplan
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:   <u>United States v. Thomas Gassnola, a/k/a "T.J.,"</u>
      **No. 18 Cr. 252 (LAK)**

Dear Judge Kaplan:

   The Government respectfully submits this letter, pursuant to Section 5K1.1 of the United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines"), to advise the Court of the pertinent facts concerning the substantial assistance Thomas Gassnola, a/k/a "T.J.," the defendant, has provided in the investigation and prosecution of individuals involved in corruption of collegiate basketball.   Most significantly, as the Court is aware, Gassnola assisted in the prosecution and conviction of three individuals, an Adidas executive, an Adidas consultant, and an aspiring sports agent in *United States v. Gatto*, *et al.*, 17 Cr. 686 (LAK).   In light of the defendant's substantial assistance, as set forth in additional detail below, and assuming that Gassnola continues to comply with the terms of his cooperation agreement and commits no additional crimes before sentencing, the Government intends to move at sentencing that the Court sentence in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Sentencing Guidelines. This Court has scheduled Gassnola's sentencing for September 10, 2019, at 3:00 p.m.

I.   **Case Background**

   Gassnola's prosecution arose out of a broader investigation by the United States Attorney's Office and the Federal Bureau of Investigation.   On September 26, 2019, the United States Attorney's Office charged ten individuals across three cases, including an Adidas executive and four Division I college basketball coaches, for college basketball related fraud and corruption schemes (collectively, the "NCAA defendants").   In particular, in *Gatto*, three defendants were charged with conspiring to defraud the University of Louisville and the University of Miami in connection with the awarding of athletic scholarships.

The Honorable Lewis A. Kaplan
August 27, 2019
Page 2 of 9

Shortly thereafter, on October 18, 2019, FBI agents approached Gassnola, who had been intercepted over wiretaps during the investigation discussing payments to student-athletes, and served him with a subpoena. Gassnola retained counsel, began proffering, and also provided the Government with numerous documents, including text messages detailing his involvement and the involvement of others in the charged scheme. In particular, during proffer sessions, Gassnola candidly admitted his participation and role in the scheme, detailing a series of payments to student-athletes, all made with and funded by Gatto and Adidas, including payments and criminal conduct the Government had not been aware of prior to Gassnola's cooperation. On March 30, 2018, Gassnola pled guilty to conspiracy to commit wire fraud pursuant to a cooperation agreement. As detailed herein, Gassnola was a critical cooperating witness at the October 2018 trial in *United States v. Gatto et al*.

## II.      Gassnola's Criminal Conduct

As the Court is well aware, Gassnola and his co-conspirators – including James Gatto, Merl Code, and Christian Dawkins – engaged in a scheme to funnel illicit payments to the families of amateur student-athletes bound for National Collegiate Athletic Association ("NCAA") Division I schools to ensure that the student-athletes matriculated at universities sponsored by Adidas, a global athletic apparel company. (Gassnola Presentence Investigation Report, dated August 14, 2019 ("PSR") ¶¶ 20-21). Gatto was the Director of Global Sports Marketing for Adidas's Basketball Program, overseeing significant components of Adidas's high school and college basketball programs, and hoped to sign successful student-athletes when they turned professional. (PSR ¶¶ 21, 28). Code and Gassnola served as consultants for Adidas, working directly with college basketball coaches, and Gassnola also ran a successful amateur basketball program that was sponsored by Adidas. (PSR ¶¶ 21, 29, 32). Dawkins, who had worked for several years for a professional sports management company and had recently founded his own agency, had relationships with some of the student-athletes' families and coaches, and he solicited money from Adidas on their behalf. (PSR ¶¶ 21, 31).

Gatto, Gassnola, Code, and Dawkins, made the payments to the student-athletes at a critical juncture—right around the time when the student-athletes were committing to a particular college and, more specifically, in connection with their decisions to attend Adidas-sponsored universities. (PSR ¶ 20). Moreover, and so as to ensure the success of their scheme, they took steps to conceal the payments to the student-athletes' families from the universities, including creating sham invoices and passing the money indirectly through multiple accounts, including amateur programs controlled by Code and Gassnola, in order to conceal its source and purpose (PSR ¶ 21), because they knew had the universities, and their compliance staffs, known of the illicit payments, they could not and would not have issued the athletic scholarships to the student-athletes (PSR ¶ 22).

In particular, Gassnola made payments on behalf of Adidas and Gatto in order to ensure student-athletes would attend and play at three Adidas-sponsored universities, the University of Louisville, the University of Kansas, and North Carolina State University. Gassnola's involvement in the scheme with respect to each school is summarized briefly below.

The Honorable Lewis A. Kaplan
August 27, 2019
Page 3 of 9

### A. North Carolina State University Scheme

In approximately 2015, after learning from an assistant coach at North Carolina State University that Dennis Smith, Jr., a student-athlete who was, at the time, widely regarded as the top high school recruit in the state of North Carolina, was considering de-committing from the university, Gassnola and Gatto agreed to make a payment to Smith, Jr.'s father to ensure Smith Jr. committed to North Carolina State University.  (PSR ¶¶ 34-35).  Specifically, in October and November 2015, Gassnola withdrew $40,000 from his amateur team's bank account, flew down to Raleigh, North Carolina and gave the money to the assistant coach, who told Gassnola that the money would be delivered to Smith, Jr.'s trainer.  (PSR ¶ 36).  After Gassnola told Gatto about the situation, Gatto caused Adidas to reimburse Gassnola for the cash payment by approving multiple sham invoices intended to cover the payment.  (*Id.*).  Less than two weeks after Gassnola delivered the payment intended for the family of Smith Jr., Smith Jr. formally committed to attend North Carolina State University.  (PSR ¶ 37).  Smith Jr. played one year for North Carolina State University before turning professional.  (PSR ¶ 38).  Gatto attempted to sign Smith Jr. to a sponsorship deal but was unsuccessful, and Smith Jr. signed with a competitor sports apparel company.

### B. University of Kansas Scheme

From approximately October 2016 through approximately November 2017, Gatto and Gassnola conspired to illicitly funnel approximately $90,000 from Adidas to the mother of Billy Preston in connection with his decision to attend the University of Kansas, another Adidas-sponsored school.  (PSR ¶¶ 39-41).  Gatto and Gassnola further agreed to funnel money to the legal guardian of Silvio de Sousa in return for his agreement to de-commit from the University of Maryland and instead attend the University of Kansas.  (PSR ¶¶ 42-43).

Beginning in the Fall of 2016, and around the time Preston committed to Kansas, Preston's mother solicited and Gassnola agreed to begin making a series of substantial payments to Preston's mother, all done with the blessing of Gatto who funded each of the payments with money from Adidas. (PSR ¶ 39).  In particular, and over the course of nearly a year, Gatto and Gassnola funneled approximately $90,000 to Preston's mother, all funded by Adidas pursuant to a series of sham invoices submitted by Gassnola and approved by Gatto.  (PSR ¶¶ 39-41).  The first payment – a $30,000 cash delivery made by Gassnola to Preston's mother in a hotel room in Manhattan – occurred a mere week before Preston and his mother both signed the first of a series of documents and certifications required by the University of Kansas.  (PSR ¶ 40).

After the initial arrests in this case, and after the University of Kansas had begun an investigation into Preston's eligibility, Preston's mother asked Gassnola to lie to the university about the payments he and Gatto had made, which Gassnola agreed to do.  (PSR ¶ 45).  In particular, in or around November 2017, which, as Gassnola acknowledged during his testimony, was after he had been approached by law enforcement but before he started cooperating with the Government, Gassnola directed his counsel to provide a statement to the University of Kansas about the payments he had made to Player, which Gassnola knew to be false and misleading.  (*Id.*).

The Honorable Lewis A. Kaplan
August 27, 2019
Page 4 of 9

        In addition to the payments to Preston's family, in or around August of 2017, Silvio de
Sousa's legal guardian requested that Adidas pay to help secure de Sousa's commitment to attend
the University of Kansas, which Gassnola and Gatto then agreed to do.  (PSR ¶ 42).  As discussed
on a call between Gatto and Gassnola played at trial, the payments were intended to help de Sousa
de-commit from a rival school and to permit de Sousa's legal guardian to repay illicit payments he
had received from a supporter of that rival school.  (PSR ¶¶ 42-43).  Gassnola made an initial
$2,500 payment funded by Gatto in August 2017.  However, after the initial arrests in this case,
Gassnola and Gatto did not make the planned additional payments of tens of thousands of dollars.

### C.  University of Louisville Scheme[1]

        Lastly, in or around May 2017, Dawkins discussed with Gassnola and Code the possibility
of Brian Bowen Jr. attending Louisville, in return for a substantial illicit payment from Adidas.
(PSR ¶ 46).  Gassnola offered that he could get approval from Adidas and Gatto for a $25,000
payment, but ultimately Dawkins worked with Code to secure an agreement for Adidas and Gatto
to pay $100,000 to secure Bowen Jr.'s commitment to attend Louisville.  (PSR ¶ 46).  Dawkins
then worked directly with Code and Gatto, hashing out an agreement to pay $100,000 to Brian
Bowen Sr. in four installments of $25,000 each.  (PSR ¶ 48).

        On June 1, 2017, one day after Code texted Dawkins that the deal was "done," Bowen, Jr.
committed to the University of Louisville.  (*See* GX 102S-2).  In order to conceal the scheme,
Gatto, Code, and Dawkins caused the money to be transferred indirectly from Adidas through an
Adidas sponsored amateur program controlled by Code, before arranging for the cash delivery of
the first installment by Munish Sood to Bowen Sr. in a New Jersey parking lot on July 13, 2017.
(PSR ¶¶ 48-49).  After the scheme was revealed, Bowen Jr. was rendered ineligible to play
collegiate basketball.

## III.   Gassnola's Cooperation

        Gassnola's cooperation was critical to the Government's successful prosecution of Gatto,
Code, and Dawkins in *United States v. Gatto et al*.  First, information provided by Gassnola
allowed the Government to significantly expand the scope of its investigation and charges, which
initially included only the University of Louisville and the University of Miami, to include
payments to the families of three additional student-athletes at two additional Adidas-sponsored
schools, the University of Kansas and North Carolina State University.  Second, as part of his
cooperation, Gassnola testified over the course of three separate days at trial, including three
lengthy cross-examinations, and provided the jury with a detailed, insider's view of the influence

---

[1]     In addition, Gassnola had knowledge of and some involvement in a plan to funnel as
much as $150,000 from Adidas, as approved by Gatto, to the family of Nassir Little in
connection with his decision to attend the University of Miami, another Adidas-sponsored
school.  Unbeknownst to either Gatto or Gassnola at the time, co-defendants Dawkins and Code
in fact planned to split and pocket the money rather than giving any of it to the Little family.
Nonetheless, in proffer sessions, Gassnola admitted to and provided information about his
knowledge of and involvement in the Miami scheme as well.

The Honorable Lewis A. Kaplan
August 27, 2019
Page 5 of 9

of sports apparel company money on amateur athletics and how Gatto, Code, and Dawkins undertook and executed their criminal scheme.  Gassnola's testimony was compelling and credible, he explained his actions and those of other scheme participants, and he took responsibility for his own misconduct.

As a part of his cooperation agreement, Gassnola became the first of any of the NCAA defendants charged across three cases to plead guilty to a crime, accepting responsibility for all of the conduct described above, including, as noted, a number of unlawful payments the Government learned of only through Gassnola's cooperation.

A.  Gassnola's Initial Cooperation

As noted above, Gatto, Code, Dawkins, and seven others, including four college basketball coaches, were arrested in September 2017, as a result of complaints charging various offenses arising from fraud and corruption in college basketball.  Gassnola was not charged at that time. Shortly thereafter, on October 18, 2017, Gassnola was approached by FBI agents at his home and he agreed to talk to them.  Gassnola spoke with the agents for a period of time before indicating that he wanted to retain counsel before answering any additional questions.  Shortly thereafter, and through counsel, Gassnola expressed an interest in meeting with the Government in an effort to explore cooperation.

Over the course of several lengthy proffer sessions, Gassnola spoke openly about his involvement in criminal conduct, describing his relationship with Gatto, Code, Dawkins, and others, and the payments to the families of student-athletes he made and facilitated on behalf of Adidas, in his role as a consultant in an effort to help the company in the "shoe wars."  From the outset, Gassnola demonstrated a firm commitment to accepting responsibility for his conduct and answered the Government's questions candidly.  Gassnola spoke truthfully about his interactions with Gatto -- despite what was a very close personal relationship with the man who had hired him and had become one of his closest friends -- and he was similarly candid and forthcoming in describing his dealings with numerous other scheme participants.

In particular, and in addition to confirming details about the planned payments to the Bowen and Little families which were known to law enforcement, Gassnola identified a series of unlawful payments that had not, at that point, been identified during the investigation, including the $90,000 in payments to the mother of Billy Preston and the $40,000 payment to the handler of Dennis Smith Jr. Moreover, Gassnola also provided the Government with documentary and electronic evidence – all of which implicated Gassnola himself – that corroborated those accounts, including his text messages with Preston's mother, and bank records documenting two of the illicit transfers.

Based in significant part on information provided by Gassnola, on April 10, 2018, the Government was able to obtain a superseding indictment against defendants Gatto, Code, and Dawkins, No. S1 17 Cr. 686, which added additional charges and broadened the scope of the charged conspiracy to include the University of Kansas and North Carolina State University as victims.

The Honorable Lewis A. Kaplan
August 27, 2019
Page 6 of 9

B.  Gassnola's Guilty Plea

On March 30, 2018, Gassnola waived indictment and pled guilty, pursuant to a cooperation agreement, to an information charging conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349. [2]  This guilty plea exposes Gassnola to a maximum term of incarceration of 20 years. [3]

C.  Gassnola's Trial Testimony

As a part of his cooperation agreement, Gassnola was required to testify at trial against Gatto, Code, and Dawkins.  As the Court observed, Gassnola's testimony was vital with respect to establishing significant parts of the charged conduct.  In particular, while the Government's evidence regarding the payments to the family of Brian Bowen Jr. and the scheme to defraud the University of Louisville was well developed through recorded calls and the testimony of other witnesses, the remaining conduct – including Count Three which turned entirely on payments to the family of Billy Preston who enrolled at the University of Kansas -- rested heavily on Gassnola's testimony.  Similarly, the Government's evidence with respect to the scheme to defraud North Carolina State University turned almost entirely on the testimony of Gassnola.

Over the course of three days, Gassnola testified clearly and without reservation, truthfully answering questions from both the Government and on cross examination about the steps that he, Gatto, Code, and Dawkins took to pay the families of student-athletes on behalf of Adidas in connection with the students' decisions to enroll at Adidas-sponsored universities and grassroots programs.  He recounted in detail meetings and discussions he had with Gatto, Dawkins, and Code, among others, regarding payments he made on behalf of Adidas to the families of at least five student-athletes.  He also explained in detail how his longtime friend Gatto would approve the payments to the families of various student athletes and then cause Adidas to wire tens of thousands of dollars at a time, via Gassnola's grassroots program, pursuant to sham invoices intended to conceal the illicit payment.  Gassnola also detailed how he would then deliver those payments, frequently in person and in cash.

---

[2]      The PSR mistakenly states that the date of Gassnola's plea was April 11, 2018, and that the plea has not been accepted.  (PSR ¶ 4).  Gassnola pled guilty before Magistrate Judge Barbara Moses on March 30, 2018, and Judge Victor Marrero accepted the plea on April 9, 2018, prior to the case being reassigned to Your Honor. (*See* Dkt. 11).  The docketing of Gassnola's case was delayed until April 11, 2018, likely leading to the confusion.

[3]      As a part of his cooperation, and as he testified at trial, Gassnola disclosed to the Government that, in connection with a 2017 home mortgage application, the defendant transferred funds from his grassroots program's account to his partner's personal account to mislead the lender as to his partner's net worth.  The loan was approved, and the mortgage payments are current.  Gassnola agreed in the cooperation agreement that such conduct constitutes relevant conduct for purposes of sentencing.

The Honorable Lewis A. Kaplan
August 27, 2019
Page 7 of 9

Gassnola also provided the jury with important background information on the defendants, Adidas and the improper and criminal influence of money in college basketball. He helped the jury understand Adidas's business and the defendants' motivations, including why it was valuable to each of them to steer student-athletes to Adidas-sponsored schools. Gassnola also described his understanding of NCAA rules and the role of a compliance department at each of the victim universities. He further explained to the jury not only that the payments were concealed from the universities but why he and his co-conspirators needed to and did conceal the payments. Finally, Gassnola unambiguously and repeatedly acknowledged his understanding that the universities – as institutions – did not know of or condone the payments and further acknowledged that to the extent any university employee was aware of or solicited the payments (as Gassnola testified was the case at North Carolina State University), he understood they were not authorized or permitted by the university to do so.

## IV.   Substantial Assistance Provided by Gassnola

Gassnola complied fully with the requirements of his cooperation agreement. He met with the Government on numerous occasions for multiple hours at a time, travelling significant distances to do so; he was consistently truthful, complete, and forthcoming. And he participated in other meetings via teleconference, frequently on short notice, as needed. Through these meetings, Gassnola was honest, both about his own misconduct and about the misconduct of others. Throughout these meetings, it was clear that Gassnola understood that he had made significant errors by engaging in the charged conduct and felt genuinely sorry for the universities and student-athletes who were harmed as a result. As noted above, his cooperation enabled the Government to expand and successfully prosecute an important prosecution of corruption involving the improper influence of corporate money in college basketball. Moreover, shortly after the convictions in this case, and based in large part on the strength of the Government's evidence at trial, numerous other defendants in the NCAA cases, including coaches who were separately charged, decided to plead guilty.

The Government briefly addresses each of the Section 5K1.1 factors below:

A.   "[S]ignificance and usefulness" of assistance (5K1.1(a)(1))

Gassnola's cooperation was both highly significant and very useful, and contributed substantially to the vindication of the public's interest in a particularly important, hard fought, and difficult case. As discussed above, his cooperation was instrumental in obtaining convictions of three defendants, most notably Gatto, Adidas's global director of sports marketing for basketball. Gassnola's first-hand account of how Adidas operated was critical in demonstrating the formation and goals of the conspiracy, revealing the scope of the charged conduct, and shining a light on the pervasiveness of the criminal conduct. His testimony also strengthened the Government's proof at trial. As detailed above, although the corrupt scheme involving Bowen, Jr. was largely documented in wiretapped phone calls, Gassnola's testimony provided a narrative and context that otherwise would have been much harder for the jury to understand. And, without his cooperation, the Government would not have been able to charge the conduct related to Smith, Jr., Preston, and de Sousa. Gassnola's cooperation also resulted in the discovery of text messages that the

The Honorable Lewis A. Kaplan
August 27, 2019
Page 8 of 9

Government would not otherwise have had, and the interpretations of wiretapped calls that were sometimes coded and opaque.

B.  "[T]ruthfulness, completeness, and reliability" of information and testimony (5K1.1(a)(2))

The Government assessed Gassnola to have been truthful, as he provided complete and reliable information from the beginning of his cooperation, which allowed the Government to further build its investigation and prepare for trial.  He answered questions honestly, both during meetings with the Government and during his direct testimony and cross examination.  Gassnola was careful to be precise and accurate in describing his knowledge and avoided overstating or straying beyond the facts that he could remember.

C.  "[N]ature and extent" of assistance (5K1.1(a)(3))

Gassnola's cooperation was extensive by virtually any measure.  He met or spoke with the Government dozens of times, usually for hours at a time, and frequently on short notice in the lead up to trial.  He walked the Government through hundreds of documents, including text messages, bank records, and invoices, as well as many wiretapped conversations, oftentimes going over the same documents again and again to ensure that the Government, and later the jury, fully understood the course of events.  He made sure to provide the Government with any additional relevant documents and information, even when the evidence further implicated him.  He testified over the course of three days at trial, including intense cross examination by multiple lawyers.

D.  "[A]ny injury suffered, or any danger or risk of injury to the defendant or his family" resulting from assistance (5K1.1(a)(4))

While the Government is not aware of any danger or risk of injury to the defendant or his family, it bears mention that his cooperation required Gassnola to provide information about and ultimately testify against one of his closest friends, Gatto.  Gassnola's cooperation also resulted in significant harm to his reputation and personal relationships in the amateur basketball world, and it effectively ended his ability to work with young athletes, a pursuit to which he had dedicated most of his adult life.

E.  "[T]imeliness" of assistance (5K1.1(a)(5))

Gassnola began cooperating shortly after being approached by law enforcement after certain co-conspirators had been arrested.  He proffered extensively prior to being charged himself, at a time when his knowledge of the schemes remained of significant use to the Government's ongoing investigation, and he was the first defendant to plead guilty at a time when his co-conspirators not simply professed their innocence but maintained that the charged conduct was not criminal.  Because of Gassnola's timely assistance, the Government was able to secure a superseding indictment in *United States v. Gatto, et al.*, and Gassnola was able to testify in the resulting trial.

The Honorable Lewis A. Kaplan
August 27, 2019
Page 9 of 9


### V.      Conclusion

In light of the foregoing, the Government respectfully submits that Gassnola's assistance was "significan[t] and useful[]" to the Government in its investigation and prosecution of a criminal scheme involving the corrupt influence of sportswear money in college basketball. *See* U.S.S.G. § 5K1.1(a)(1).  The Government also believes that the information provided by Gassnola was "truthful[], complete[], and reliab[le]." *See id*. § 5K1.1(a)(2).  Accordingly, assuming that Gassnola continues to comply with the terms of his cooperation, and commits no additional crimes before sentencing, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the U.S. Sentencing Guidelines, that the Court sentence Gassnola in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Guidelines.


Respectfully Submitted,

GEOFFREY S. BERMAN
United States Attorney

By:      /s/ *Eli J. Mark*
Eli J. Mark
Assistant United States Attorney
Southern District of New York
(212) 637-2431


cc:      Daniel Kelly, Esq. (by ECF)
U.S. Probation Officer Johnny Y. Kim (by email)